Cite as 2021 Ark. App. 239

# ARKANSAS COURT OF APPEALS

DIVISION IV
**No.** CV-20-523

|  |  |  |
|---|---|---|
| | | **Opinion Delivered:** May 12, 2021 |
| JERRY JEFFERS | | |
| | APPELLANT | APPEAL FROM THE SEBASTIAN COUNTY CIRCUIT COURT, GREENWOOD DISTRICT |
| V. | | [NO. 66GDR-12-227] |
| | | |
| MONICA WIBBING | | HONORABLE ANNIE POWELL HENDRICKS, JUDGE |
| | APPELLEE | |
| | | AFFIRMED |

## KENNETH S. HIXSON, Judge

This is a domestic-relations dispute between appellant Jerry Jeffers and appellee Monica Wibbing. Monica has primary custody of the parties' eight-year-old son, W.J., and Jerry filed a motion seeking joint custody. The trial court entered an order denying Jerry's motion finding that there had been no material change in circumstances and that joint custody was not in W.J.'s best interest. Jerry now appeals from the trial court's order.

On appeal, Jerry argues that the trial court erred in denying his request for joint custody of W.J. Jerry also argues that, because the trial court erred in failing to award joint custody, the trial court's award of child support against Jerry was also erroneous. Finally, Jerry challenges a provision in the trial court's order that prohibits the parties from having overnight guests of the opposite sex to whom they are not married while W.J. is in their care. We affirm.

Although Jerry and Monica were never married, they were in a relationship that resulted in the birth of W.J. in July 2012. Pursuant to a petition filed by Monica, the trial court entered an order on April 1, 2014, that established Jerry as W.J.'s father and ordered Jerry to pay $175 in weekly child support. The order provided that W.J. shall remain in Monica's primary custody subject to Jerry's visitation. Jerry's visitation was premised on a gradually increasing scale that continued until W.J. reached age three, at which time Jerry was awarded standard visitation consisting primarily of Jerry having visitation every other weekend. When the April 1, 2014 order was entered, Monica was living in Greenwood, Arkansas, and Jerry lived in Charleston, Arkansas. Jerry worked for a drilling company in Oklahoma and Texas, where he would be out of town working for seven days and then be at home off work for seven days.

On May 14, 2019, Jerry filed a motion for joint custody. In Jerry's motion, he made the following allegations:

2. At the time of the entry of the Order awarding Jerry visitation, Jerry did work most of the time out of town and was away for extended periods of time.

3. Jerry's work schedule is now such that Jerry will work for two (2) weeks out of town and then Jerry is off work and back home for a period of two (2) weeks. Jerry resides in the same home town as Monica and the minor child, which is the City of Greenwood, Arkansas.

4. Jerry has another child which was born during this year, 2019. Jerry lives in a stable and wholesome environment and has stable employment. The parties' minor child should be allowed to enjoy and be a part of Jerry's home and family environment.

5. Monica works a full-time job and is working during the periods that Jerry is off work.

6. The favored custody arrangement now for the State of Arkansas as reflected by the public policy statement of the Arkansas General Assembly is that parents

2

should be awarded joint custody when possible. There is no reason why Jerry should not be able to enjoy joint custody and for the minor child to benefit from a joint custody arrangement where the minor child can spend equal time with both parents.

In his motion, Jerry also asked that his child-support obligation be abated or reduced.

In Monica's answer to Jerry's motion, she denied that joint custody should be awarded. Monica also filed a countermotion to modify visitation and for contempt. In her countermotion, Monica asked that the previously ordered visitation be modified based on Jerry's current work schedule to ensure that visitation occurred when Jerry was home from work. In addition, Monica sought to hold Jerry in contempt for an arrearage in his child-support obligation.[1]

A hearing on Jerry's motion and Monica's countermotion was held on January 21, 2020. Three witnesses testified at the hearing: Jerry, the mother of Jerry's second child, and Monica.

Jerry testified that he moved from Charleston to Greenwood in the beginning of 2018. He stated that he lives in a three-bedroom house that is only a five-minute drive from Monica's house. Jerry stated that he moved there to be closer to W.J.

Jerry stated that he has a nine-month-old son, B.J. B.J. and B.J.'s mother, Makaela Eudey, live with Jerry. Jerry is not married to Makaela, and he stated that she moved in with him in July 2018, which was shortly after she became pregnant with B.J. Jerry testified that W.J. and his little brother, B.J., get along great.

---

[1]Although Jerry was ultimately held in contempt and ordered to pay back child support, these findings are not at issue in this appeal.

3

Jerry testified that he works for Latshaw Drilling, which requires him to work in Oklahoma and Texas. This job formerly required him to work one week on and one week off. However, beginning in 2015, Jerry's work schedule changed, and now he works two weeks on and two weeks off.

Jerry indicated that he has a close and loving relationship with W.J. He stated that they are "best friends." Jerry stated that Monica has always thought of him as a good father and that he "absolutely" thinks Monica is a good mother.

Jerry testified that between 2014 and 2019 he and Monica worked very well together in making decisions involving W.J. and in accommodating Jerry's visitation with W.J. Jerry indicated that Monica would often afford him significant visitation beyond the court–ordered standard–visitation schedule. However, Jerry stated that this changed in early 2019 when Monica became less cooperative and was resistant to affording him extra visitation. Jerry made no claim that Monica had denied him any visitation under the court-ordered standard-visitation schedule, but he stated that she began denying him his once weekly "first right of refusal" visit that was to be exercised during Monica's work hours.[2] However, Jerry stated that he had no complaints about Monica's mothering and that "I wouldn't say she's done anything negative." Jerry stated,"I would just like to have more time with my son."

Jerry testified that W.J. has been diagnosed with ADHD. He agreed that, in light of that diagnosis, it was very important for W.J. to have a consistent routine.

---

[2]This "first right of refusal" visit was ordered by the trial court in the April 1, 2014 order. However, the parties disagreed about whether this "first right of refusal" visit was still effective given that it was part of the provisions in the order that granted Jerry gradually increasing visitation during the first two years of W.J.'s life. The 2014 order provided that the standard-visitation schedule controlled when W.J. turned three years old.

4

Makaela Eudey testified next. Makaela stated that she and Jerry have considered getting married. She stated that W.J. interacts well with her son, B.J., and loves him. Makaela stated that Jerry is a great father to W.J. and that they have a great relationship. Makaela stated that Jerry spends as much time with W.J. as he can, and she knew of no reason why Jerry should not be awarded equal time with W.J.

Monica Wibbing was the final witness to testify. Monica stated that she owns a house in Greenwood and has worked for Americold in Fort Smith for the past ten years. Monica was married to Billy Wibbing and they have a four-year-old daughter together. Monica and Billy divorced in 2016, and Monica stated that they agreed to joint legal custody but that she is the primary physical custodian of her daughter. Monica currently has a boyfriend, Bryan, whom she has dated for almost a year. Monica stated that Bryan has a house nearby and does not spend the night at her house when W.J. is there.

Monica acknowledged that there was some conflict between her and Jerry beginning in late 2018 when she confronted him about his child-support arrearage. Monica stated that things got hostile, so she decided to limit Jerry's visitation to the court-ordered standard-visitation schedule. Monica stated that W.J. loves both of his parents, and she agreed that Jerry is a good father.

Monica stated that W.J., who has ADHD, has been in a routine schedule, and she thought it was important that he maintain his routine. Monica testified that a change to joint custody would be disruptive to W.J., and she asked that she remain the primary custodian.

5

At the conclusion of the hearing, Monica moved for a directed verdict arguing that Jerry had not met the threshold requirement of showing a material change in circumstances.[3] Jerry argued that he had shown a material change in circumstances and contended that there was no reason why joint custody should not be granted. The trial court announced from the bench that it was directing a verdict in favor of Monica with respect to Jerry's motion for joint custody.

On May 8, 2020, the trial court entered an order denying Jerry's request for joint custody. The trial court found:

> On or about April 1, 2014, this Court entered an Order establishing paternity of the minor child (W.J., DOB: 07/19/2012) and awarding [Monica] primary custody, subject to visitation with [Jerry] pursuant to the Court's Standard Order with an initial transition period. The Court finds that at the time of the entry of the 2014 Order, [Jerry] was working a schedule of seven days on and seven days off in the oilfield. The Court finds that since the entry of the 2014 Order, there has been no material change in the circumstances warranting a modification of custody. Specifically, the Court finds that the time [Jerry] has available and home from work is no greater now than at the time the 2014 Order was entered. The Court further finds that there has been no change in [Monica's] situation which constitutes a material change in circumstances either. The Court further finds that a modification of custody is not in the best interest of the minor child; specifically, the Court finds that it is not in the best interest of the child for the Court to order a joint custodial arrangement based on the fact that [Jerry] is gone two solid weeks, every other two weeks and the fact that the evidence is clear that [Monica] has been the primary parent for the minor child.

The trial court also modified the visitation schedule, based on W.J.'s ADHD and need for consistency, to where Jerry's visitation was for seven consecutive days each month during

---

[3]Because this was a bench trial, this was actually a motion to dismiss rather than a motion for directed verdict. *See* Ark. R. Civ. P. 50(a).

6

times when Jerry was off work.[4]   In the order, the trial court also reduced Jerry's weekly child-support obligation from $175 a week to $164.68 a week based on Jerry's 2019 wages. Finally, the order "specifically prohibits both parties from having overnight guests of the opposite sex to whom they are not married while the child is in their care."

Jerry's first argument on appeal is that the trial court erred in denying his motion to modify custody to joint custody.  The party seeking modification of the custody order has the burden of showing a material change in circumstances.  *Horton v. Parrish*, 2015 Ark. App. 306, 461 S.W.3d 718.   Generally, courts impose more stringent standards for modifications in custody than they do for initial determinations of custody to promote stability and continuity in the life of the child and to discourage repeated litigation of the same issues.  *Id*.  Once the trial court determines that the threshold requirement of a material change in circumstances since the last order of custody has been met, the trial court must then determine which party should have custody with the sole consideration being the best interest of the child.  *Id*.

Generally, in reviewing child-custody cases, we consider the evidence de novo, but we will not reverse the trial court's findings unless clearly erroneous.  *McNutt v. Yates*, 2013 Ark. 427, 430 S.W.3d 91.   Here, however, a different standard applies because the trial court granted Monica's motion to dismiss at the close of Jerrys case.[5]

_____

[4]In Jerry's first point on appeal, he assigns error to this modification in visitation, but this point is not further developed in Jerry's brief.  Instead, Jerry's first argument is directed toward his claim that the trial court erred in denying his motion for joint custody.

[5]As previously stated, the trial court granted Monica's motion to dismiss although it was mischaracterized as a motion for directed verdict.

The trial court must use the same legal standard in evaluating a motion to dismiss as it would in evaluating a motion for directed verdict. *Rymor Builders, Inc. v. Tanglewood Plumbing Co., Inc.*, 100 Ark. App. 141, 265 S.W.3d 151 (2007). The supreme court has held that a trial court's duty is to review a motion for directed verdict or dismissal at the conclusion of a plaintiff's case by deciding whether, if it were a jury trial, the evidence would be sufficient to present to the jury. *Woodall v. Chuck Dory Auto Sales, Inc.*, 347 Ark. 260, 61 S.W.3d 835 (2001). A motion for directed verdict should be granted only if there would be no substantial evidence to support a jury verdict. *Id.* In making that determination, the trial court does not exercise fact-finding powers that involve determining questions of credibility. *Montigue v. Jones*, 2019 Ark. App. 237, 576 S.W.3d 46. Moreover, in determining whether the trial court should have granted the motion, we review the evidence in the light most favorable to the party against whom the verdict is sought and give it its highest probative value, taking into account all reasonable inferences deducible from it. *Id.* Where the evidence is such that fair-minded persons might reach different conclusions, the directed verdict (or dismissal) should be reversed. *Id.*

Under these standards, Jerry contends that fair-minded persons could have found a material change of circumstances from the evidence presented. Jerry asserts that there were numerous material changes, including his relocation from Charleston to Greenwood, the development of his relationship with W.J., the change in his work schedule, Monica's decreased level of cooperation, and the fact that Monica now has another child. Jerry also argues, on the basis of this same evidence, that fair-minded persons could have found that joint custody was in W.J.'s best interest.

8

Reviewing the evidence in the light most favorable to Jerry and giving it is highest probative value, we nonetheless hold that fair-minded persons could only conclude that Jerry failed to prove a material change of circumstances affecting the best interest of W.J. Therefore, we hold that the trial court did not err in granting Monica's motion to dismiss Jerry's joint-custody petition.

Our supreme court has held, in the context of child-custody modification, that an appellant cannot use the circumstances he created as grounds to modify custody. *Brown v. Brown*, 2012 Ark. 89, 398 S.W.3d 159. "Our supreme court has been clear that relocation alone is not a change in circumstances warranting a change in custody nor are circumstances created by the party seeking the modification." *Dent v. Wyatt*, 2014 Ark. App. 343, at 2; *see Davenport v. Uselton*, 2013 Ark. App. 344 (holding that the father failed to prove a material change in circumstances to support his petition when he was the one who relocated, and a party should not be permitted to allege a material change of circumstances that he himself has created).

While Jerry's decision to move closer to W.J. may be commendable, this change was created by Jerry voluntarily. Jerry's relocation, his developing relationship with W.J., and the change in his work schedule were circumstances attributable to Jerry and were insufficient, standing alone, to support a material change in circumstances. Moreover, as found by the trial court, there were no changes with Monica's situation that would constitute a material change of circumstances. Although there was some evidence of hostility between Jerry and Monica after Monica approached him about his child-support arrearage in late 2018, Jerry acknowledged that Monica has always been a good mother, and

9

he admitted that she had done nothing negative since the April 1, 2014, order was entered. Since the initial order was entered, Monica has remained in Greenwood and has remained employed at the same job. Although Monica does now have another child, this is not a material change bearing on Jerry's request for joint custody. Having reviewed the evidence presented, we conclude that the trial court committed no error in dismissing Jerry's motion for joint custody on the basis that there was a lack of evidence supporting a material change in circumstances.

Jerry's next argument is that the child support awarded by the trial court was erroneous. Jerry's argument is premised on his claim that the trial court erred in not awarding joint custody. However, having affirmed the trial court's denial of joint custody, we affirm the trial court's child-support award as well.

Finally, Jerry argues that the trial court erred in ordering the parties to not have overnight guests of the opposite sex to whom they are not married while W.J. is in his or her care. The trial court made these pertinent findings from the bench:

> The Court is going to continue to follow the fit and wholesome environment standard, which is that I am not going to allow overnight guests of the opposite sex to whom the father or mother, either one, is romantically involved in the presence of the child.[6] I think that's confusing. This premise may change in my mind at some point in the future, but based upon no testimony from Ms. Eudey, I heard no testimony from her regarding her relationship with this child. In the confusion of it all, I'm going to stay with the no overnight guests of the opposite sex to whom you're romantically involved in the presence of the child. So you'll have to—if you want that visitation to continue like that, you all will have to figure out how to remedy that situation. That's just the way I continue to see it, and based upon her testimony, or lack of testimony, regarding your relationship.

---

[6]The trial court's April 1, 2014 order also contained this provision.

In support of his argument that the trial court erred in this regard, Jerry relies on *Moix v. Moix*, 2013 Ark. 478, 430 S.W.3d 680.  In *Moix*, the appellant father was in a long-term relationship with his domestic male partner and requested visitation with his child.  Appellant was granted visitation.  The trial court's order found that it was *required* by the public policy of this state to impose a noncohabitation restriction preventing appellant's partner from being present during overnight visits.  The trial court noted that appellant and his partner were in a long-term committed relationship, that they had resided together for at least five years, and that appellant's partner posed no threat to the health, safety, or welfare of appellant's child.  Other than the "prohibition" on unmarried cohabitation with a romantic partner in the presence of a minor child, the trial court found no other factors present to militate against overnight visitation. The appellant father appealed.

On appeal, the supreme court in *Moix* recognized the long-standing public policy of the courts of this state that a parent's extramarital cohabitation with a romantic partner in the presence of the children, or a parent's promiscuous conduct or lifestyle, has never been condoned. However, the *Moix* court reversed and remanded because, rather than making a finding on whether the noncohabitation provision was in the child's best interest, the trial court erroneously found that mandatory application of our public policy against unmarried cohabitation *required* it to include a noncohabitation provision. The supreme court held that the primary consideration in domestic-relations cases is the welfare and best interest of the children and all other conditions are secondary.  While the *Moix* court recognized the policy against romantic cohabitation in the presence of the children, it stated that cohabitation must be considered under the circumstances of each particular case and in light of the best interest

of the child. The supreme court stated that "we agree with appellant that the public policy against romantic cohabitation is not a 'blanket ban,' as it may not override the primary consideration for the circuit court in such cases, which is determining what is in the best interest of the children involved." *Moix*, 2013 Ark. 478, at 12, 430 S.W.3d at 687. Thus, the supreme court in *Moix* reversed and remanded for the trial court to make the determination based on the best interest of the child.

Jerry argues that the trial court erred in deciding the overnight-cohabitation issue without considering the child's best interest. Jerry states that the trial court's ruling in this regard was based on its mistaken belief that there was no relationship between W.J. and Makaela. Jerry contends that the evidence showed that W.J. has a positive relationship with Makaela as well as with his nine-month-old younger brother and that the overnight-cohabitation ban was not in W.J.'s best interest.[7]

We conclude that this case is readily distinguishable from *Moix* because in this case the trial court made it clear that it was not imposing a blanket prohibition against extramarital cohabitation; its decision was instead based on the facts of this case. The trial court found that there was no testimony from Makaela regarding her relationship with W.J., and this finding was accurate. Nonetheless, Jerry directs us to Monica's testimony in an attempt to establish Makaela's relationship with W.J. In Monica's testimony, she stated that Makaela was "good to W.J." and "not mean to him" and that, according to Jerry, Makaela

[7]It is not an insignificant consideration that Jerry has been in a relationship with Makaela for over eighteen months and that they have a child together. This child is W.J.'s half brother. The trial court made no mention of how this prohibition would affect W.L.'s relationship with his half brother.

sometimes helped W.J. with his homework. Monica also indicated she was concerned that members of Makaela's family were sometimes referred to as W.J.'s "grandmother" or "cousin" when there was no familial relationship. However, as found by the trial court, Makaela gave no testimony to establish the extent of her relationship with W.J.

In our de novo review, we will not reverse this finding by the trial court unless it was clearly erroneous. *Klenakis v. Klenakis*, 2017 Ark. App. 36, 510 S.W.3d 821. In *Moix*, *supra*, the supreme court recognized the longstanding public policy that a parent's extramarital cohabitation with a romantic partner in the presence of the child has never been condoned. The supreme court in *Moix* also made it clear that this is not a blanket rule and that this determination must be based on the particular facts of the case and the best interest of the child. Here, the trial court was mindful of the public-policy consideration against extramarital cohabitation and the prohibition of a blanket ban as set forth in *Moix*. Based on these considerations and the evidence presented, the trial court stated in pertinent part:

> The Court is going to continue to follow the fit and wholesome environment standard, which is that I am not going to allow overnight guests of the opposite sex to whom the father or mother, either one, is romantically involved in the presence of the child. I think that's confusing. This premise may change in my mind at some point in the future [.]

While the trial court did not state this particular provision in the order was "in the best interest of the child," it did state that such visitation with overnight guests of the opposite sex is "confusing." It is clear from the context of the trial court's statement that it was referring to the best interest of the child. On this record, we cannot conclude that this finding was clearly erroneous.

Affirmed.

GLADWIN and BARRETT, JJ., agree.

*Brett D. Watson, Attorney at Law, PLLC*, by: *Brett D. Watson*, for appellant.

*Bryant & Estell, LLC*, by: *Veronica L. Bryant*, for appellee.